FILED

2014 Oct-31  PM 12:16
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| C O U R T N E Y    O R L A N D O  CRUTCHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV-10-S-1176-NE |
| | ) | |
| ATHENS POLICE DEPARTMENT; | ) | |
| W A Y N E   H A R P E R ;   R A N D Y | ) | |
| VICKERS;  and  THE  CITY  OF | ) | |
| ATHENS, | ) | |
| | ) | |
| Defendants. | | |

## MEMORANDUM OPINION

Courtney Orlando Crutcher commenced this action as a *pro se* plaintiff,[1] but now is represented by an attorney. His original complaint alleged numerous claims against Athens, Alabama, Police Officer Randy Vickers, the City of Athens, Alabama, the Athens Police Department, and Athens Police Chief Wayne Harper.  The gravamen of his claims was that Officer Vickers choked him when effecting an arrest

---

[1] While all complaints, including plaintiff's *pro se* complaint, refer to plaintiff as "*Courtney* Orlando Crutcher," *see* doc. no. 32 (Second Amended Complaint); doc. no. 26 (Amended Complaint); and doc. no. 1 (Complaint), plaintiff's response in opposition to summary judgment refers to plaintiff as "*Cordney* Orlando Crutcher," and even notes that references to "Courtney" are incorrect. *See* doc. no. 79 (Opposition to Summary Judgment), at 10 ("he witnessed 'an Athens City police officer choke Courtney [sic] Crutcher while he was in handcuffs.'") (quoting doc. no. 1 (Complaint), at 7) (alteration in original).  Because the iteration was handwritten atop the first document filed in this case, and, therefore, is in the official caption of this case, the court will call plaintiff Courtney Orlando Crutcher, where necessary, with apologies if this is incorrect.

on December 8, 2008.[2]   All defendants except the City of Athens responded to the

complaint by filing motions to dismiss.[3]   The court granted the motions filed by

Police Chief Wayne Harper and the Athens Police Department, but denied the motion

filed by Officer Randy Vickers.[4]   Thereafter, plaintiff twice amended his complaint,[5]

and Vickers and the City of Athens filed motions to dismiss the amended pleadings.[6]

The court granted the motions in part, and dismissed several of plaintiff's claims.[7]

---

[2] Doc. no. 1 (Complaint), at ECF 5-6.  "ECF" is the acronym for "Electronic Case Filing," a system that allows parties to file and serve documents electronically.  *See Atterbury v. Foulk*, No. C-07-6256 MHP, 2009 WL 4723547, *6 n.6 (N.D. Cal. Dec. 8, 2009).  Bluebook Rule 7.1.4 *permits* citations to the "page numbers generated by the ECF header."  *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 257 n.5 (D.D.C. 2011) (citing *The Bluebook: A Uniform System of Citation* R. B. 7.1.4, at 21 (Columbia Law Review Ass'n *et al.*, 19th ed. 2010)).  Even so, the Bluebook recommends "against citation to ECF pagination in lieu of original pagination."  *Wilson*, 772 F. Supp. 2d at 257 n.5.  Thus, unless stated otherwise, this court will cite the original pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number with the letters "ECF."

[3] *See* doc. no. 8 (Motion to Dismiss by Athens Police Department); doc. no. 10 (Motion to Dismiss by Wayne Harper); doc. no. 11 (Motion to Dismiss by Randy Vickers).

[4] Doc. no. 23 (Memorandum Opinion and Order Dismissing Fewer than All Defendants).

[5] *See* doc. no. 26 (Amended Complaint); doc. no. 32 (Second Amended Complaint).  Plaintiff first filed motions for leave to amend his complaint, *see* doc. no. 26 (Motion for Leave to File Amended Complaint); doc. no. 33 (Motion for Leave to File Second Amended Complaint), which this court granted.  *See* doc. no. 28 (Order Granting Motion for Leave to Amend); Text Order dated April 19, 2011.  The Second Amended Complaint "incorporates all paragraphs from [the] previous complaint and amended complaint."  Doc. no. 32 (Second Amended Complaint), ¶ 1 (alteration supplied).  Thus, the court will cite to portions of the amended complaint when describing the claims asserted against Officer Vickers and the City of Athens.

[6] *See* doc. no. 34 (Third Motion to Dismiss by Randy Vickers); doc. no. 36 (Motion to Dismiss by the City of Athens).  Officer Vickers had already filed a motion to dismiss the first amended complaint, *see* doc. no. 31 (Second Motion to Dismiss by Randy Vickers), but this court found his motion moot in light of plaintiff's second amended complaint.  *See* Text Order dated April 19, 2011.

[7] Doc. no. 54 (Order Dismissing Fewer than All Claims).  The dismissed claims included: failure to intervene, unlawful search and seizure, denial of due process, deliberate indifference,

The only claims that remain pending against defendants Vickers and City of Athens are a federal claim for excessive force, and supplemental state-law claims for assault and battery and outrage.[8]  The action presently is before the court on defendants' motion for summary judgment.[9]

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is

---

negligent supervision, and inadequate training.

[8] *Id.*

[9] Doc. no. 76 (Motion for Summary Judgment).

only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied).  *see also Saucier v. Katz*, 533 U.S. 204, 201 (2001) ("A court required to rule upon the qualified immunity issue must consider . . . this threshold question: *Taken in the light most favorable to the party asserting the injury*, do the facts alleged show the officers conduct violated a constitutional right?") (emphasis supplied).

## II.  SUMMARY OF FACTS[10]

---

[10] The following statements are the "facts" for summary judgment purposes only, and may not be the actual facts.  *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).  The court has gleaned these statements from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party.  *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  Note well, however, that plaintiff failed to include his disputes with defendants' claimed undisputed facts, organized in separately numbered paragraphs that coincide with those of defendants' claimed undisputed facts as required by the Uniform Initial Order entered on June 30, 2010.  *See* doc. no. 14, at 16.  Instead, he provided a "Narrative Statement of Disputed Facts."  *See* doc. no. 79 (Opposition to Summary Judgment), at 2-4.  Although plaintiff does dispute some contentions contained in defendants' claimed undisputed facts, he does not address all of them.  Thus, those facts that defendants contend are undisputed, which plaintiff did not contest, will be deemed admitted for summary judgment purposes.

Randy Vickers has been employed as a police officer for the City of Athens, Alabama, since February 2, 2005.[11]  He first encountered plaintiff in the Spring of 2008, when he stopped plaintiff's automobile on Sanderfer Road in Athens, because plaintiff was not wearing a seatbelt.[12]  Vickers asked plaintiff for his driver's license, but he did not have one.[13]  Plaintiff was traveling with a licensed female passenger at the time, however, so Vickers issued only a verbal warning to plaintiff, rather than a written citation, and allowed the female to drive the vehicle away from the scene with plaintiff as her passenger.[14]

Officer Vickers's next encounter with the plaintiff occurred on the evening of December 8, 2008.[15]  Vickers was on duty in his police cruiser, traveling south on Hines Street,[16] when he passed plaintiff, who was northbound on the same public roadway.[17]  Plaintiff was exceeding the speed limit.[18]  After passing Officer Vickers, plaintiff pulled into the parking lot of T&T Grocery (a convenience store), exited his vehicle, walked to the front door of the store, and began talking to a friend, David

---

[11] Doc. no. 77-3 (Vickers Deposition), at 8-9.

[12] *Id.* at 29-30.

[13] *Id.* at 39-40.

[14] *Id.* at 40.

[15] *Id.* at 32; doc. no. 73-1 (Plaintiff Deposition), at 35, 44.

[16] Doc. no. 77-3 (Vickers Deposition), at 34-35, 44.

[17] *Id.* at 34.

[18] *Id.*  Officer Vickers registered plaintiff's speed with a radar gun.  *Id.* at 35.

Kirby.[19]  About thirty second later, Officer Vickers pulled into the parking lot and activated his lights.[20]  He then walked up to plaintiff and asked for his driver's license.[21]  Once again, plaintiff did not have a license,[22] but he provided his Social Security number at Vickers's request.[23]  Vickers called the police dispatch operator and ascertained through the use of plaintiff's Social Security number that his driver's license had been revoked.[24]  He then called for a wrecker to tow plaintiff's automobile to an impoundment facility.[25]  That upset plaintiff, and Vickers asked him to sit in his patrol cruiser while he conducted an inventory search of plaintiff's vehicle prior to its impoundment.[26]  Plaintiff complied, but Vickers was unable to locate a tag receipt while searching the automobile.[27]  He allowed plaintiff to retrieve the receipt from his vehicle.[28]

---

[19] Doc. no. 73-1 (Plaintiff Deposition), at 45-46.

[20] Doc. no. 73-3 (Vickers Deposition), at 36.

[21] Doc. no. 73-1 (Plaintiff Deposition), at 46.  Officer Vickers alleges that, "as [he was] pulling into the gas station, [plaintiff] jumped out of his car and ran and tried to duck down behind a truck that was at the gas pump."  Doc. no. 77-3 (Vickers Deposition), at 36.

[22] Doc. no. 73-3 (Vickers Deposition), at 38.  Plaintiff testified that, when Vickers asked him for his license, he told Vickers, "you don't know that that was me driving the truck or anything." Doc. no. 73-1 (Plaintiff Deposition), at 50.

[23] Doc. no. 73-3 (Vickers Deposition), at 38.

[24] *Id.* at 38.

[25] *Id.* at 40.

[26] *Id.* at 40-41

[27] *Id.* at 43.

[28] *Id.*

After obtaining the tag receipt, Officer Vickers attempted to issue two written citations — speeding, and driving while revoked — but plaintiff refused to sign the citations, saying that he was "not going to sign shit."[29]   Vickers told plaintiff that he would have to take him to jail if he did not sign the tickets.[30]   That further upset plaintiff, and he threatened to kill Vickers when he saw him "out of [his] uniform."[31]

Vickers radioed for backup, and told plaintiff to turn around and place his hands behind his back.[32]   Plaintiff did not immediately comply but, instead, continued to curse Vickers and threaten him.   Vickers asked plaintiff to turn around several more times.[33]   Finally, after approximately eight such requests, plaintiff turned around and allowed Vickers to handcuff him.[34]   While Vickers was doing so, he rhetorically asked:  "what [are] you going to do when you see me?"[35]

Vickers opened the back door to his police cruiser and instructed plaintiff to sit inside, but he refused to do so.[36]   Vickers ordered plaintiff several more times, but plaintiff refused to comply, and continued to threaten Vickers.[37]   What happened next

---

[29] Doc. no. 73-3 (Vickers Deposition), at 46-47.

[30] *Id.* at 47.

[31] *Id.* at 48 (alteration supplied).

[32] *Id.* at 48, 50.

[33] *Id.* at 48.

[34] *Id.* at 49.

[35] Doc. no. 77-1 (Plaintiff Deposition), at 55 (alteration supplied).

[36] Doc. no. 77-3 (Vickers Deposition), at 49.

[37] *Id.* at 52-53.

is contested.

Defendants contend that Officer Vickers applied a so-called "brachial plexus clavicle notch nerve pressure point control technique" to compel plaintiff's compliance with his directives.[38]   That control technique is administered by pressing downward on the shoulder, between the neck and the clavicle.[39]   Through its use, Vickers was able to place plaintiff in the backseat of the patrol car without further incident.[40]

Plaintiff, on the other hand, contends that Vickers "took his forearm and he put it in [plaintiff's] neck," and Vickers "had his body weight on" plaintiff's neck while plaintiff's "back went against the car."[41]   Plaintiff blacked out and, when he regained consciousness, his "head was in the floorboard [of the police car] and [his] right foot was on the window."[42]

The tow-truck and backup police officer did not arrive until after plaintiff had

_____

[38] Doc. no. 77-3 (Vickers Deposition), at 53. Prior to the incident with plaintiff, Vickers attended the police academy for twelve weeks, where he was trained on several restraint techniques, including handcuffing and pressure point control techniques such as the "brachial plexus clavicle notch nerve pressure point control technique."  *Id.* at 8-10, 53-54, & 107-08.

[39] *Id.* at 127-28.

[40] *Id.* at 54.

[41] Doc. no. 77-1 (Plaintiff Deposition), at 59 (alterations supplied).   Plaintiff originally testified that Vickers "took both his hands and choked [plaintiff]."  *Id.* at 56 (alterations supplied). He later clarified, however, that Vickers did not squeeze plaintiff's throat with his hands, he only put his forearm against plaintiff's throat.  *Id.* at 65-66.

[42] *Id.* at 59 (alterations supplied).

been placed in Vickers's police cruiser.[43]  Vickers asked the backup officer to complete the impoundment of plaintiff's automobile, while he transported plaintiff to the police department for booking.[44]  Plaintiff's grandmother, Dorthy Malone,[45] who had arrived at some point, asked Vickers if she could take plaintiff's vehicle, rather than having it towed, but Vickers denied her request, saying that, "if she would have been there earlier before the wrecker was called" he would have allowed her to drive the car away from the scene.[46]

While Vickers filled out the booking paperwork at the police department, plaintiff continued to threaten him, saying he was "going to get [Vickers] when [he's] not in [his] uniform, [and that] he knows where [Vickers] live[s], knows [Vickers] goes to Walmart late at night, [and] knows [Vickers's] family."[47]  Plaintiff eventually was charged with speeding, driving while revoked, harassment, resisting arrest, and disorderly conduct.[48]  The day after his arrest, plaintiff visited the doctor for a stiff neck, and was diagnosed with a muscle sprain.[49]  Later, in June of 2009, plaintiff

---

[43] Doc. no. 77-3 (Vickers Deposition), at 54.

[44] *Id.* at 55.

[45] Dorthy Malone did not witness the confrontation between plaintiff and Officer Vickers, but she received several telephone calls "telling her about what happened, so she left from [her] house and came to the store." Doc. no. 77-1 (Plaintiff Deposition), at 74.

[46] *Id.* at 68; doc. no. 77-3 (Vickers Deposition), at 55.

[47] Doc. no. 77-3 (Vickers Deposition), at 61 (alterations supplied).

[48] *Id.* at 33.

[49] Doc. no. 77-1 (Plaintiff Deposition), at 91-92.

observed Officer Vickers "reenact choking [plaintiff] like from the incident at the [T&T] store" in his police cruiser.[50]

In the Winter of 2009, Officer Vickers was near a Jiffy gas station in Athens when he heard loud music coming from a car, and saw plaintiff "throwing his hands up at [Vickers]."[51]  Vickers attempted to give plaintiff a written citation for a violation of the city's noise ordinance, but plaintiff refused to sign it, telling Vickers that "he's not signing shit . . . to keep his fucking license, and [that Vickers didn't] have him stopped because [he] didn't have [his] blue lights on."[52]  Plaintiff then got into his automobile and was attempting to leave, but Vickers pulled out his taser and ordered plaintiff out of the vehicle.[53]  Plaintiff complied, and Vickers arrested him for disorderly conduct.[54]

## III.  DISCUSSION

Plaintiff alleges three claims against defendants:  a federal claim, asserted under 42 U.S.C. § 1983, that Vickers employed excessive or unreasonable force in violation of rights guaranteed to plaintiff by the Fourth Amendment to the United

---

[50] *Id.* at 87 (alterations supplied).

[51] Doc. no. 77-3 (Vickers Deposition), at 83 (alterations supplied).

[52] *Id.* at 83-84 (alterations supplied).

[53] *Id.* at 84.

[54] *Id.* at 82, 84.

States Constitution;[55] and supplemental state-law claims for assault and battery and outraged, asserted under 28 U.S.C. § 1367.[56]

## A.   Qualified Immunity for Plaintiff's Excessive Force Claim

Defendants contend that the doctrine of qualified immunity shields Officer Vickers from liability for plaintiff's Fourth-Amendment excessive-force claim. That doctrine provides "immunity from suit to governmental officials performing discretionary functions as long as 'their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Green v. Brantley*, 941 F. 2d 1146, 1148 (11th Cir. 1991) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The purpose of the doctrine is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *Lee v. Ferraro*, 284 F.3d 1188, 1193–94 (11th Cir. 2002). It protects from

---

[55] *See* doc. no. 26 (Amended Complaint), ¶¶ 13-14. In relevant part, the Fourth Amendment provides that: "The right of the people to be secure in *their persons*, houses, papers, and effects, against *unreasonable* searches and *seizures*, shall not be violated . . . ." U.S. Const. amend. IV (1791) (emphasis supplied). The "incorporation" of the Fourth Amendment into the Due Process Clause of the Fourteenth Amendment and, thereby, its application to the various states, was finalized by the Supreme Court's decision in *Mapp v. Ohio*, 367 U.S. 643 (1961). *See also*, *e.g.*, *Ker v. California*, 374 U.S. 23 (1963); *Wolf v. Colorado*, 338 U.S. 25 (1949). Plaintiff's complaint does not explicitly mention 42 U.S.C. § 1983, but that statute, nevertheless, creates a private cause of action for damages and injunctive relief against individuals and governmental bodies whose conduct under color of state law deprives a plaintiff of "rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983; *Arnold v. Board of Educ. of Escambia County*, 880 F.2d 305, 310 (11th Cir. 1989).

[56] *See* doc. no. 26 (Amended Complaint), ¶¶ 15-17, 29-31.

suit "all but the plainly incompetent or one who is knowingly violating the federal law." *Hope v. Pelzer*, 536 U.S. 730, 752 (2002) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *see also, e.g., Lee*, 284 F.3d at 1193–94; *Chesser v. Sparks*, 248 F.3d 1117, 1121–22 (11th Cir. 2001).

Courts generally apply a two-part test for determining whether a defendant is entitled to claim the benefits of the doctrine of qualified immunity.  The "threshold question" is:  Do the facts, viewed "in the light most favorable to the party asserting the injury," show that the police officer's conduct violated a constitutional right? *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If that question is answered "yes," then the court will proceed to analyze the second part of the inquiry:  *i.e.*, Was the right "clearly established"?  *Id*.[57]

**1**.   *Did Officer Vickers's use of force violate the Fourth Amendment?*

The Supreme Court has said that "all claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment

---

[57] The Supreme Court recently relieved lower courts from mandatory adherence to the order of the two-part analytical framework established by the *Saucier* opinion.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory.").  It now is within the court's discretion to, in appropriate cases, assume that a constitutional violation occurred for the purpose of addressing, in the first instance, whether such a violation would be "clearly established."  *Id*.  Nevertheless, under the circumstances of this case, *Saucier's* tested sequence of analysis will be followed.

and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989).  A determination of the reasonableness of an officer's use of force "requires analyzing the totality of the circumstances." *Plumhoff v. Rickard*, — U.S. —, 134 S. Ct. 2012, 2020 (2014).[58]

The reasonableness of the force applied also is measured as of the precise moment it is administered.  Events that occurred prior to that moment, though perhaps giving factual context to the use of force, are not probative of the reasonableness of the decision to use force.  *See Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991).  Additionally, "[u]se of force must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) (quoting *Graham*, 490 U.S. at 396) (alteration supplied). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain,

---

[58] The court may consider a number of factors when determining whether the force applied was "reasonable" under the circumstances, including: (1) the "severity, or lack of severity, of the alleged crime in issue," *Graham*, 490 U.S. at 396; (2) "whether the person against whom the force was used posed an immediate threat to the safety of the police or others," *id.*; (3) "the need for the application of force," *Jackson v. Sauls*, 206 F.3d  1170 n. 18 (11th Cir. 2000); (4) "the relationship between the need and the amount of force used," *id.*; (5) "the extent of the injury inflicted," *id.*; (6) "whether the force was applied in good faith or maliciously and sadistically," *id.*; (7) "the possibility that the persons subject to the police action are themselves violent or dangerous," *id.*; (8) "the possibility that the suspect may be armed," *id.*; (9) "the number of persons with whom the police officers must contend at one time," *id.*; and (10) "whether the suspect was resisting or fleeing." *Id.*

and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

Even when an officer's use of force is unreasonable, however, there is "a *de minimis* level of imposition with which the Constitution is not concerned." *Ingraham v. Wright*, 430 U.S. 651, 674 (1977). *See also Nolin v. Isbell*, 207 F.3d 1253, 1255-56 (11th Cir. 2000) (emphasis supplied).

Defendants contend that Vickers's use of the "brachial plexus clavicle notch nerve pressure point control technique" was a *de minimis* use of force that lies outside the protection of the Fourth Amendment.[59]   As an initial matter, the court must address some of the evidence that plaintiff has submitted in opposition to defendants' motion for summary judgment that is inconsistent with plaintiff's deposition testimony, such as the affidavit of his cousin, Brenda Crutcher,[60] stating that "Officer Vickers had his hands around the neck of [plaintiff] and was choking him."[61] Defendants argue that Brenda Crutcher's statement should not be considered because it contradicts plaintiff's own testimony: *i.e.,* that Vickers took *his forearm* and placed

---

[59] Doc. no. 78 (Brief in Support of Summary Judgment), at 16-22.

[60] Brenda Crutcher was "getting ready to get off [Highway] 72 in the turning lane in front of the store to turn on to Hine[s] Street" when she witnessed the confrontation between plaintiff and Officer Vickers.  Doc. no. 77-1 (Plaintiff Deposition), at 70.

[61] Doc. 79-3 (Affidavit of Brenda Crutcher), ¶ 6 (alterations supplied).  Other such evidence includes several signed statements attached to plaintiff's complaint from purported witnesses that claim to have seen Officer Vickers choke plaintiff.  *See* doc. no. 1 (Complaint), at ECF 7-8.

it against plaintiff's throat.  That inconsistency presents an unusual circumstance: that is, the plaintiff's testimony actually is more harmful to his case than the testimony of some of the witnesses.  While the court is required to construe all facts in the light most favorable to plaintiff for purposes of summary judgment, that duty does not extend to rejecting the plaintiff's own testimony when it is harmful to his case.  As the Eleventh Circuit has stated:

> When the nonmovant has testified to events, we do not . . . pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant.  Instead, when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version.*  Our duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part: the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided.

*Evans v. Stephens,* 407 F.3d 1272, 1278 (11th Cir. 2005) (emphasis in original). Thus, the court will accept plaintiff's testimony, and finds for purposes of evaluating the motion for summary judgment that Officer Vickers did not wrap *his hands* around plaintiff's neck, but pushed *his forearm* against plaintiff's throat.

Defendants also assert that plaintiff's description of the incident — *i.e.,* that Vickers took his forearm and pushed it against plaintiff's throat — is *consistent with* Vickers's testimony about the pressure-point control-technique he applied.[62]  This

---

[62] Doc. no. 80 (Reply Brief in Support of Summary Judgment), at 6-7.

court disagrees.

Vickers testified that he placed his right hand on plaintiff's left shoulder, between the neck and clavicle, and pressed downward.[63]  Plaintiff, however, stated that Vickers's forearm (not his right hand) was pressed against his throat (not between his neck and clavicle).[64]  In fact, plaintiff later asserted that Vickers's forearm was against the *front* of his throat, as opposed to the *side* of his neck, where the control technique normally would have been applied.[65]  Thus, plaintiff's testimony is not *consistent with* Vickers's description of the "brachial plexus clavicle notch nerve pressure point control technique," and it is plaintiff's testimony that will be credited for purposes of ruling upon the motion for summary judgment.

Looking at the facts known to Officer Vickers at the moment when he applied force to plaintiff, but accepting plaintiff's version of the facts, plaintiff resisted arrest by refusing Officer Vickers's order to sit inside his police car, and Vickers responded by mashing his forearm against the front of plaintiff's throat, thereby choking him until he passed out, and then pushing plaintiff's unconscious body into the police car.

Some courts have held that "a choke hold . . . without more, constitutes the use of *de minimis* force." *Eggleton v. Jackson*, No. 09-cv-81292, 2011 WL 379186, at

---

[63] Doc. no. 77-3 (Vickers Deposition), at 127-28.

[64] Doc. no. 77-1 (Plaintiff Deposition), at 59.

[65] *Id.* at 65-66.

*12 (S.D. Fla. Jan. 13, 2011). *See also Watson v. Hall*, No. 1:07cv928(TSE/TRJ), 2008 WL 149133, at *5–6 (E.D. Va. Jan. 8, 2008) (holding that a choke hold was not excessive force when it caused only *de minimis* injury). This court agrees. Plaintiff was actively resisting arrest, cursing Vickers, threatening him with future harm, and some degree of force was necessary to place plaintiff into Officer Vickers's patrol car. *See Graham*, 490 U.S. at 396 ("the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it"). By placing his forearm against plaintiff's throat, Officer Vickers was able to subdue plaintiff and effect his arrest. Plaintiff suffered only minor, non-permanent injuries (*i.e.*, a muscle sprain in his neck). Thus, no more force than necessary to effect an arrest without the assistance of a backup officer was used.

Even assuming for the sake of discussion that Officer Vickers's use of force was not *de minimis*, it was still reasonable under the circumstances. The Eleventh Circuit has held that a police officer's use of a choke hold was reasonable even when a suspect was not resisting arrest, but had previously been arrested for violently resisting arrest, because "a reasonable officer . . . could have concluded that the technique was needed to stop [the suspect] from becoming violent." *Post v. City of Fort Lauderdale*, 1552, 1559 (11th Cir. 1993). *See also Wesson v. Oglesby*, 910 F.2d 278, 284 (5th Cir. 1990) (choke hold used on prisoner was not excessive force even

17

though it allegedly caused brief unconsciousness). Here, plaintiff was actively resisting his arrest by refusing to enter Officer Vickers's patrol car. Vickers needed to apply *some* force to effect plaintiff's arrest, and his application of force only resulted in minor injuries to plaintiff. Under those circumstances, Vickers's application of force was reasonable. Accordingly, plaintiff has not established that Officer Vickers violated the Fourth Amendment.

**2.**   *Was it clearly established that Vickers's conduct was unlawful?*

Even if this court had found a violation of the Fourth Amendment, Vickers still would be entitled to summary judgment because plaintiff has not demonstrated that Vickers violated a "clearly established" constitutional right.

In determining whether a constitutional right is clearly established, "'the salient question is whether the state of the law [at the time of the unconstitutional act] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'" *Williams v. Consolidated City of Jacksonville*, 341 F.3d 1261, 1270 (11th Cir. 2003) (alterations in original) (quoting *Hope*, 536 U.S. at 741). The Supreme Court has rejected the requirement that the facts of previous cases must always be "materially similar" to those facing the plaintiff. *Hope*, 536 U.S. at 739. Instead, for a constitutional right to be "clearly established,"

its contours "must be sufficiently clear that a reasonable official would

18

understand that what he is doing violates that right. *This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see Mitchell* [*v. Forsyth*, 472 U.S. 511,] 535, n.12, 105 S. Ct. 2806, 86 L. Ed. 2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

*Hope*, 536 U.S. at 739 (emphasis supplied, alteration in original).

As the Eleventh Circuit has observed, there are various ways in which an officer may be placed on "fair warning" that his or her conduct in specific circumstances may violate the constitution or federal law.

First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances to overcome qualified immunity, even in the *total absence of case law*. This kind of case is one kind of "obvious clarity" case. For example, the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful.

Second, if the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face, we then *turn to case law*. When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts. *See Marsh* [*v. Butler County*], 268 F.3d [1014,] 1031-32 n.9 [(11th Cir. 2001)]. For example, if some authoritative judicial decision decides a case by determining that "X Conduct" is unconstitutional *without tying* that determination to a particularized set of facts, the decision on "X Conduct" can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding "X Conduct" are immaterial to the violation. These judicial decisions can control "with

19

obvious clarity" a wide variety of later factual circumstances. These precedents are hard to distinguish from later cases because so few facts are material to the broad legal principle established in these precedents; thus, this is why factual differences are often immaterial to the later decisions. But for judge-made law, there is a presumption against wide principles of law. And if a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so "with obvious clarity" to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.

Third, if we have no case law with a broad holding of "X" that is not tied to particularized facts, we then look at precedent *that is tied to the facts*. That is, we look for cases in which the Supreme Court or we, or the pertinent state supreme court has said that "Y Conduct" is unconstitutional in "Z Circumstances." We believe that most judicial precedents are tied to particularized facts and fall into this category. . . . When fact-specific precedents are said to have established the law, a case that is fairly distinguishable from the circumstances facing a government official cannot clearly establish the law for the circumstances facing that government official; so, qualified immunity applies. On the other hand, if the circumstances facing a government official are not fairly distinguishable, that is, are materially similar, the precedent can clearly establish the applicable law.

*Vinyard v. Wilson*, 311 F.3d 1340, 1350-52 (11th Cir. 2002) (emphasis in original,

alterations supplied). *See also Ashcroft v. al-Kidd*, — U.S. —, 131 S. Ct. 2074, 2083

(2011) ("We do not require a case directly on point, but existing precedent must have

placed the statutory or constitutional question beyond debate.").

It should also be noted that it is the plaintiff who bears the burden of

establishing that the constitutional right at issue was clearly established at the time

of the violation.  *Youmans v. Gagnon*, 626 F.3d 557, 562 (11th Cir. 2010).  Plaintiff

has not done so.  Instead, he argues only that, "[e]ven if no prior case law exists as to

an officer choking a handcuffed arrestee unconscious, Vickers is still sufficiently on

notice that his conduct violated established principles."[66]  This court disagrees.

In light of the Eleventh Circuit's opinion in *Post v. City of Fort Lauderdale*,

*supra*, this is not an "obvious clarity" case.  Thus, the court must turn to case law to

determine whether the purported constitutional violation was clearly established at

the time Officer Vickers employed force against plaintiff.

Plaintiff contends that the constitutional right in this case was "clearly

established" by the case law of *Thornton v. City of Macon*, 132 F.3d 1395 (11th Cir.

1998), an excessive force case in which the Eleventh Circuit found that police

officers were not entitled to qualified immunity.  In that case,

> Marjorie Mullis called the Macon city police department on June
> 5, 1990.  She explained to the dispatcher that she wanted the assistance
> of a police officer in resolving a dispute between [Mark] Thornton and
> herself.   Mullis and Thornton had lived together in Thornton's
> apartment, but had parted ways over two years earlier.  Mullis explained
> that she had a set of keys to Thornton's car, which she used periodically,
> and that Thornton wanted her to return those keys.   She had told
> Thornton that if she had to return the keys, then he would have to return
> a mattress that she had left in his apartment.   Mullis explained that she
> wanted an officer to assist her in exchanging the keys for the mattress.
>
> Officer [Desmond] Coleman was dispatched to Mullis' residence.

---

[66] Doc. no. 79 (Response in Opposition to Summary Judgment), at 17.

Mullis explained the situation to Coleman and asked him to take the keys to Thornton.   Coleman agreed to do so and proceeded to Thornton's apartment, which was located across the street in the same block as Mullis' apartment.   When Coleman arrived, Thornton was standing on the front porch of his apartment, which was on the ground floor of the apartment house.   Coleman explained to Thornton that he was there to return the keys and to pick up Mullis' mattress.   Thornton responded by telling Coleman that he had done nothing wrong and that he wanted Coleman to leave the premises.   At some point during this initial exchange, Mullis arrived on the scene.   Thornton became upset and entered his apartment, closing a screen door behind him.   Once inside, Thornton stood at the screen door and repeatedly told Coleman and Mullis to leave.

Instead of leaving, Coleman called for backup.   Less than a minute later, Officers [Jhristian] Lodge and [Ziva] Beddingfield arrived on the scene.   Coleman briefed them on the situation.   Thornton repeated his desire that the officers leave.   The officers tried unsuccessfully to get Thornton to come out on the porch and talk to them.   Finally, they told him that if he opened the screen door, they would give him his car keys.

As Thornton opened the door to get the keys, the officers charged into the apartment.   One of the officers grabbed Thornton's arms, and another grabbed Thornton around the neck.   The officers threw Thornton to the floor, cuffed his hands behind his back, picked him up by his arms, dragged him outside and shoved him into a police car.

[Tommy] Cravey was an acquaintance of Thornton's and had been doing some repair work on the apartment house.   When the officers arrived, Cravey was sitting in a pickup truck parked in the apartment house driveway; he had come to the house to check on his brother Earl, who was working there that day.   While in the truck, Cravey observed the officers arrest Thornton and put him in the patrol car.   As the officers took Thornton to the car, Thornton yelled to Cravey; he wanted Cravey to call his mother and his lawyer and to lock his apartment.   Cravey got out of the truck and approached the officers to ask if he could enter the apartment to use the phone.   One of the officers responded by patting

22

> Cravey down; he found a pocket knife on Cravey's person.  The officer
> charged Cravey with "obstruction," slammed him down on the hood of
> a police car, and cuffed his hands behind his back.  The officer placed
> Cravey in the back seat of the police car with Thornton.

*Thorton*, 132 F.3d at 1397-98 (alterations supplied).  Based upon these facts, the

Eleventh Circuit held that,

> [n]either Thornton nor Cravey was suspected of having committed a
> serious crime, neither posed an immediate threat to anyone, and neither
> actively resisted arrest.  Yet, on the facts viewed in the light most
> favorable to the plaintiffs, the officers used force in arresting both
> Thornton and Cravey.  The officers grabbed Thornton and wrestled him
> to the ground, and threw Cravey on the hood of one of the patrol cars
> before handcuffing him.  Under the circumstances, the officers were not
> justified in using any force, and a reasonable officer thus would have
> recognized that the force used was excessive.

*Id.* at 1400 (emphasis in original, alteration supplied).

The facts of this case are not similar to those at issue in *Thornton*.  Vickers

applied his forearm to plaintiff's throat only after plaintiff refused several time to

enter Vickers's police car — *i.e.,* plaintiff was actively resisting arrest — and he did

so in order to place plaintiff inside his police car.  Some degree of force was

necessary to effect plaintiff's arrest. *See Graham*, 490 U.S. at 396 (holding that "the

right to make an arrest or investigatory stop necessarily carries with it the right to use

some degree of physical coercion or threat thereof to effect it").   The officers in

*Thornton*, on the other hand, used force when neither plaintiff was refusing police

23

orders at the time the force was applied.  Thus, "the officers were not justified in using any force." *Thornton*, 132 F.3d at 1400.

Additionally, Officer Vickers applied his forearm to plaintiff's throat only for a brief interval.  The officers in the latter case, however, grabbed one of the plaintiffs by his arms and neck, threw him to the floor, cuffed his hands behind his back, picked him up by his arms, drug him outside, and shoved him into a police car.  They then slammed the other plaintiff down on the hood of a police car, and cuffed his hands behind his back. Thus, the amount of force applied in each case differed significantly.

For these reasons, the facts of plaintiff's case differ to such a degree that *Thornton v. City of Macon* did not "clearly establish" that Officer Vickers's conduct was unconstitutional on the date it occurred.  Further, the court cannot find any case law broadly establishing that, as of December 8, 2008, the date of the events underlying this case, choking a suspect was a violation of the Fourth Amendment, or narrowly establishing that choking a suspect was a violation of the Fourth Amendment when the suspect is actively resisting arrest by refusing to enter a police vehicle.  *See, e.g.*, *Post*, 7 F.3d at 1559-60.  Thus, even if Officer Vickers violated plaintiff's Fourth-Amendment rights, he still would be entitled to summary judgment based on the doctrine of qualified immunity because he did not violate a "clearly established" right.

24

**B.     Municipal Liability for Plaintiff's Excessive Force Claim**

Where, as here, there is no underlying constitutional violation,[67] there can be no municipal liability.  *See Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding that, if a plaintiff "has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point") (emphasis in original); *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) ("[T]o impose § 1983 liability on a municipality, a plaintiff must show[, among other things,] that his constitutional rights were violated.") (alterations supplied).  Even if there were some constitutional violation on which to base a theory of municipal liability, however, plaintiff's claim would still fail.

In order to hold the municipality liable, plaintiff would have to demonstrate that the City of Athens itself directly caused the violation of his constitutional rights, either through its adoption of, or failure to adopt, some official policy or practice. *See Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 695 (1978).  A theory of respondeat superior is not sufficient to support a § 1983 claim, and assertions that the City of Athens was generally responsible for the actions of its police officers do not provide a sufficiently direct link between the city's behavior

---

[67] *See supra* Part III.A.1.

and plaintiff's injury to prove liability. *See id.* at 691-92.

Defendants contend that the City of Athens is not liable for plaintiff's Fourth-Amendment excessive-force claim because "Section 1983 will not support a claim under a vicarious liability theory — even where an officer acted unconstitutionally, which is not the case here . . . ."[68] Plaintiff presents no evidence that the actions of Officer Vickers were more than an isolated incident, or that the City of Athens adopted, or failed to adopt a policy, or engaged in a custom that caused plaintiff's alleged constitutional injury.   Thus, even if Officer Vickers violated plaintiff's Fourth-Amendment rights, the City of Athens still would be entitled to summary judgment because plaintiff has failed to prove some basis for holding the city liable.

## C.   Plaintiff's State-Law Claims for Assault and Battery and Outrage

In cases where the court's jurisdiction is based solely upon a federal question, the district court has discretion to entertain state claims that are supplemental to the federal claim.   *See* 28 U.S.C. § 1367(a).   The district court may decline to exercise supplemental jurisdiction when:

(1)   the claim raises a novel or complex issue of state law,

(2)   the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)   *the district court has dismissed all claims over which it has*

_____

[68] Doc. no. 78 (Brief in Support of Summary Judgment), at 22-23.

*original jurisdiction*, or

(4)     in exceptional circumstances, there are other compelling reasons
        for declining jurisdiction.

28 U.S.C. § 1367(c) (emphasis supplied).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon University v. Cohill,* 484 U.S. 343, 350 n.7 (1988).

Here, plaintiff's federal claims have been eliminated.  Accordingly, this court declines supplemental jurisdiction over the remaining state-law claims, and exercises its discretion to dismiss those claims, but without prejudice to plaintiff's right to reassert the claims in an appropriate state forum, if he desires to do so.

## IV.  CONCLUSION

For the reasons explained above, the motion for summary judgment is due to be granted in part and denied in part.  A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE and ORDERED this 31st day of October, 2014.

United States District Judge